UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| JENNIFER MORA, ETC. | Case No. 8:18-cv-00335 |
| Plaintiffs | Judge James S. Moody, Jr. |
| *v.* | |
| VISIONWORKS OF AMERICA, INC. | |
| Defendants | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF DR. JOHN BURKE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ 3

INTRODUCTION........................................................................................................ 4

BACKGROUND .......................................................................................................... 6

    Dr. Burke's Qualifications, Report, and Testimony.................................................. 6

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ................................................................................................................ 9

    I.    DR. BURKE AND HIS TEAM DEVOTED SUBSTANTIAL TIME TO THE
DEVELOPMENT OF HIS OPINIONS AND HIS REPORT REFLECTS HIS OPINIONS. .... 9

    II.    DR. BURKE IS QUALIFIED TO OFFER AN OPINION ON THE "REGULAR"
PRICE OF VISIONWORKS' EYEGLASSES. ......................................................... 13

    III.    DR. BURKE'S OPINIONS ARE RELIABLE AND ADMISSIBLE UNDER RULE
702. …………………………………………………………………………………18

        A.    Dr. Burke's Opinions Are Grounded in Economics and Consistent with the FTC
Definition........................................................................................................ 18

        B.    Visionworks' Arguments About Testing and Peer Reviews Are Red Herrings......... 20

        C.    Dr. Burke's Methods of Calculating Damages Are Sound and Reliable. .................. 20

    IV.    DR. BURKE'S OPINIONS WOULD ASSIST THE TRIER OF FACT....................... 21

CONCLUSION .......................................................................................................... 22

PROOF OF SERVICE ............................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

16 C.F.R. 251.1(b)(2)........................................................................................ 13, 16, 17

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993)........................................ 11

*James T. Scatuorchio Racing Stable v. Walmac Stud Mgmt.*, LLC, 2014 WL 1744848 (E.D. Ky. April 30, 2014) ................................................................................................ 11

*Numatics, Inc. v. Balluff, Inc.,* 66 F. Supp.3d 934 (E.D. Mich. 2014)........................................ 11

*Shelley v. White*, 2010 U.S. Dist. LEXIS 46782, *2-3 (M.D. Ala. May 12, 2010) ..................... 11

*United States v. Kalymon*, 541 F.3d 624, 637 (6th Cir. 2008)........................................ 11

**Statutes**

Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. Chapter 501, Part II ........................ 6

**Rules**

Federal Rule of Evidence 702........................................................................ 5, 8, 11, 13

**Regulations**

16 C.F.R. 251.1(h) ................................................................................................ 6

50 F.T.C. 225 ....................................................................................................... 6

FTC Rule 16 C.F.R. §251.1 ...................................................................................... 6

## INTRODUCTION

On May 1, 2019, following a hearing on Plaintiff Jennifer Mora's ("Plaintiff's") Motion for Class Certification, the Court deferred ruling on certification until after Plaintiff and defendant Visionworks of America, Inc. ("Visionworks") complete discovery and move for summary judgment. (Dkt. 53, p. 1.) The Court expressed its concern "with what evidence exists to determine the true price of Visionworks eyeglasses and whether damages can be ascertained on a class wide basis." *Id.*

Plaintiff thereafter retained as an expert John F. Burke, Jr., Ph.D. ("Dr. Burke"), an economist with over 40 years of experience. In his revised report, Dr. Burke concludes that: (1) Visionworks did not openly and actively sell a complete pair of eyeglasses at the list prices it charged under its Buy One, Get One Free ("BOGO-Free") offers; (2) the majority of Visionworks' non-insurance single-pair transactions were at 40% off the list price and that 40% off price was the "regular" price of the list price; (3) damages can be presented on a class-wide basis by multiplying the total amounts paid by class members by 40% and deducting any separate discounts; and (4) through the electronic data Visionworks produced, which is coded by unique transaction numbers, each class member can be readily identified. (Dkt. 60-3.) After deposing Dr. Burke, Visionworks moved to exclude his testimony.

The Court should reject Visionworks' effort to exclude Dr. Burke. Contrary to Visionworks' assertions, Dr. Burke, who is eminently qualified, was substantially involved in the preparation of his report, devoting 30-40 hours to the case, engaging his own team for additional assistance, reviewing sales data and promotional calendars, and confirming Plaintiff's theories of liability and damages. While it argues that Dr. Burke's opinions are not based in economics, Dr. Burke testified that his opinions were based on his expertise in economics. Moreover,

Visionworks' own expert concedes that, as an economist, he can comment on matters that are not "terms of art in economics" if provided a legal standard and, in this case, he opines that Visionworks' "regular" price is its list price.

While conceding that Visionworks sometimes offered glasses at other prices and discounts, Dr. Burke concludes that Visionworks' most common price for a single pair of eyeglasses and its "regular" price under the applicable definition was 40% off the BOGO-free list price. That conclusion is amply supported by the electronic sales data, promotional calendars, the Federal Trade Commission's definition of a "regular" price, and the testimony of Visionworks' 30(b)(6) witness. Visionworks' suggestion that, at deposition, Dr. Burke had difficulty explaining certain data points is a red herring. The data is the data and Dr. Burke's theories of liability and damage calculations was and can be applied to that data, even if it is sorted by others. Visionworks' own expert concedes that the data can readily be searched to provide key information and, to the extent any final distinctions are needed, such as between purchaser and patient, that can be done through claims administration.

While it argues that Dr. Burke should not be permitted to testify that the "regular" price is 40% off, Visionworks' own economist, Dr. Timothy Snail, opines that the "regular" price is the list price. The Court should allow the jury to hear the experts' competing opinions and reach a conclusion. As Dr. Burke's testimony complies with Evidence Rule 702, is amply supported by the evidence, and would assist the trier of fact, the Court should deny Visionworks' motion to exclude Dr. Burke's testimony.

# BACKGROUND

**Plaintiff's Theory of Liability and Damages**

In her Class Action Complaint, Plaintiff Jennifer Mora alleges that defendant Visionworks' continuous use of "Buy One, Get One Free" (BOGO-Free) offers for eyeglasses violates the Florida Deceptive and Unfair Trade Practice Act, Fla. Stat. Chapter 501, Part II (the "Act"). The Act provides that, in determining whether a practice is "unfair and deceptive…due consideration and great weight shall be given to the interpretation of the Federal Trade Commission" ("FTC"). The FTC, in turn, prohibits a retailer from using the word "free' in its offers for more than six months during any 12-month period (*see* 16 C.F.R. 251.1(h)) and has ruled that a retailer's increasing of the ordinary and usual price of the article of merchandise required to be purchased to obtain the "free" article is unfair and deceptive (*see* 50 F.T.C. 225). FTC Rule 16 C.F.R. §251.1 provides that the word "free" indicates that the consumer is paying nothing for that article and no more than the "regular price" for the other – the "regular price" being the price at which the seller has "openly and actively" sold the product for a reasonably substantial period of time, i.e., a 30-day period. Plaintiff alleges that: under BOGO-Free, Visionworks charged more than its regular price for eyeglasses purchased; the regular price was actually 40% less than the BOGO-Free list price; and class members were damaged in the amount of 40% of the list price they paid.[1]

**Dr. Burke's Qualifications, Report, and Testimony**

Dr. John Burke is an eminently-qualified economist. (Dkt. 60-3, Exhibit A.) He received a degree in economic from Boston College in 1961 and a Ph.D. in economics from the University of Notre Dame. *Id.* He served as an Associate Professor at Cleveland State University and an

---

[1] Plaintiff proposes a class defined as: "All consumers who purchased eyeglasses from Visionworks in Florida pursuant to a "Buy One, Get One Free" offer between February 8, 2014 and February 27, 2016. (Dkt. 26, ¶26.)

Assistant Professor at Eastern Illinois University and is a member of the American Economic Association and American Statistical Association. *Id.* He has presented numerous papers and published multiple articles in the field of economics. *Id.*

In his Report, Dr. Burke concludes that "Visionworks list prices are <u>not</u> the regular prices, and that the regular prices are, in fact, 40% less than the list prices." (Dkt. 60-3 at 1.) Citing the definitions of "regular" by both Webster's Dictionary and the FTC, he states that the "regular price" is "the price at which a single pair of eyeglasses is openly and actively sold to the public." *Id*. at 1-2. He states that a price "open" if it is offered to all retail customers indiscriminately and that, in determining whether goods are actively sold, the following factors are relevant: for how long the price was available; how often the price was available; the number of sales consummated at that price; and the amount of revenue generated at that price. *Id*. at 2. He notes that the 40% off discount offer vastly outstripped any other discount in terms of both transactions and frequency (it was available every month of the relevant period) and concludes that, given the paucity of non-insurance sales at list price, Visionworks did not openly and actively sell eyeglasses at list price. *Id*. With respect to damages, he notes that the sales data produced by Visionworks is coded by a unique transaction number and each class member can be readily identified. *Id*. at 4-5. Damages can be calculated, on a class-wide basis, by multiplying the total amounts paid by class members by 40% and subtracting any other discounts and, on an individual basis, by multiplying the amount the member paid by 40% and deducting any other discounts. *Id.*

At his deposition, on cross-examination, Dr. Burke confirmed his opinion that, although other discounts were offered for brief periods, the 40% off price was the most common price and therefore the "regular" price:

> …[D]uring this relevant time period, 2014 to 2016, here's what was offered, and all that time period the 40 percent was offered, I'd say that was the

regular price. Some of the time it was 60 percent off direct mail, some the time it was 30 percent, but for every month during that time period it was offered at 40 percent off, I'd say that's the regular price.

(Dkt. 60-1 at 153.)

On re-direct examination, Dr. Burke again confirmed that key conclusion:

Q. And your conclusion was that Visionworks' list prices are not their regular prices and that the regular prices are, in fact, 40 percent less than the list prices; is that correct?

A. Yes, and that is because this company said they were offering a 40 percent discount from the regular price.

Q. And that central pair of opinions is based on your expertise in economics, primarily your training, experience and education?

A. Yes.

*Id*. at 263.

Dr. Burke's conclusions, moreover, are consistent with the testimony of Visionworks' 30(b)(6) witness, Emily White-Keating, who testified that, if a customer comes in under the BOGO, but decides not to pay the BOGO price, "They're going to get moved into an offer that's a single pair offer." (Dkt. 41-3 at 164; *see also id*. at 49 ("For the customer who comes in and does not want two pairs of glasses, we have a single pair offer.") And that single pair offer was typically 40% off list price. (Dkt. 60-3 at 3.)

At deposition, Dr. Burke confirmed that he defined an "open" price as one "offered to all retail customers indiscriminately." (Dkt. 60-1 at 181.) He also confirmed the four factors he considers relevant in determining whether a price is one at which goods were "actively sold." *Id*. at 182-183.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness is qualified as an expert under the following standard:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods;
(d) the expert has reliably applied the principles and methods to the facts of the case.

## ARGUMENT

The Court should reject Visionworks' motion to exclude Dr. Burke's testimony because: Dr. Burke is eminently qualified as an economist; he and his team devoted substantial time to developing his opinions; his opinions are based on sufficient facts and data and the product of reliable principles reliably applied; and his testimony and expertise will aid the trier of fact in understanding the evidence and determining the key facts in this case. While challenging the bases of Dr. Burke's opinions, Visionworks has advanced its own expert economist to offer opinions in the same area. Rather than exclude one expert, the Court should allow the trier of fact to hear from both experts and reach conclusions based on the competing testimony.

## I.    DR. BURKE AND HIS TEAM DEVOTED SUBSTANTIAL TIME TO THE DEVELOPMENT OF HIS OPINIONS AND HIS REPORT REFLECTS HIS OPINIONS.

Contrary to Visionworks' suggestion that he simply signed a report drafted by others, Dr. Burke and his team devoted substantial time to this case and the development of his opinions and report.

Q. How many hours have you spent on this matter so far?

A. Oh, I probably have 30 or 40 hours in. Other members of my company probably have an additional 10 to 20.

Q. What additional members of your company worked on this matter and what did they do?

A. Harvey S. Rosen and Matt Amaroso…I discussed the concepts with Harvey Rosen and with Matt, and we went over what our approach to this

> was going to be. We discussed this concept of what is the regular ongoing price. We discussed with each other the concept of a BOGO. We discussed – although I didn't report in my written papers, about the concept of price discrimination. And Harvey and Matt particularly did a lot of the technical work on looking at the data that was provided by Visionworks.

(Dkt. 60-1 at 11-12.)

Although he did not sort or format the 5.5 million lines of code produced by Visionworks, Dr. Burke reviewed the electronic sales data that was provided. *Id.* at 12. To determine how often various prices were available, he reviewed a schedule of the times and dates of availability of the prices. *Id*. at 13. He reviewed three marketing calendars that showed Visionworks' advertising campaigns for the relevant three years. *Id*. at 264. In addition, he reviewed: the Amended Complaint and Motion for Class Certification; relevant sections of the Code of Federal Regulations; the Rule 30(b)(6) depositions of Visionworks' Emily White-Keating and Jared Duley; the report of Visionworks' expert Dr. Timothy Snail; and Visionworks' discount utilization reports. *Id*. at 264; *see also, Materials Reviewed*, *attached to Dr. Burke's Initial Report*, Exhibit 1.

In preparing his opinions, Dr. Burke met multiple times with Plaintiff's counsel and reviewed Visionworks' electronic data on a computer screen. (Dkt. 60-1 at 265-266.) In those meetings, Dr. Burke received information through pivot tables and other counting and summary mechanisms within Excel. *Id.*   Dr. Burke based his conclusions on that analysis and subsequent sessions with both counsel and his own staff. *Id*. at 19-20, 266. He provided a first draft report. *Id*. at 23.

The above demonstrates that Dr. Burke was deeply involved in this case and the preparation of his opinions. He reviewed Plaintiff's allegations, he understood Plaintiff's theories of liability and damages, and he studied the electronic sales data, promotional calendars, and other relevant materials in reaching is conclusions. Those conclusions, as expressed in his report and testimony, are logical, compelling, and based on Dr. Burke's expertise and review of the evidence. They

comply with the requirements of Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

In suggesting that Dr. Burke's report was "ghost written" for him, Visionworks ignores Dr. Burke's extensive efforts and the fact that his report reflects his opinions. The cases Visionworks cites cases do not parallel Dr. Burke's deep involvement. For example, in *Numatics, Inc. v. Balluff, Inc.,* 66 F. Supp.3d 934 (E.D. Mich. 2014), on which Visionworks relies, it was uncontested that a proposed expert in a patent infringement case spent only a couple of hours reviewing a 64-page report prepared by counsel and the majority of the 25-30 hours the expert spent on the case purportedly were travel hours. Similarly, in *James T. Scatuorchio Racing Stable v. Walmac Stud Mgmt.*, LLC, 2014 WL 1744848 (E.D. Ky. April 30, 2014), a proposed expert adopted 90% of a report prepared by another after a meeting lasting 60 to 90 minutes. These extreme examples are nothing like Dr. Burke's extensive review of sales data and background materials, consultation with his internal team, analysis of the issues, adoption of his opinions, and substantial participation in the development of those opinions and his report.

In *United States v. Kalymon*, 541 F.3d 624, 637 (6th Cir. 2008), the Sixth Circuit stated that "there is nothing inherently nefarious" in counsel reducing an expert's opinions to writing. "A party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert." *Id*. at 638. In *Shelley v. White*, 2010 U.S. Dist. LEXIS 46782, *2-3 (M.D. Ala. May 12, 2010), the Court expressly followed that Sixth Circuit decision, agreed that "counsel's assistance in preparing the Rule 26 report does not make the report deficient," and rejected the argument that a proposed expert's testimony should be excluded because "she did not prepare her Rule 26 report." Here, Dr. Burke expressly testified that his report reflected his views.

*Burke Dep.* at 263. Thus, consistent with the reasoning of *Kalymon* and *Shelley*, Visionworks'

argument for exclusion should be rejected.

In suggesting that he was not substantially involved in the preparation of his report,

Visionworks argues that Dr. Burke could not explain certain details of the data he reviewed. Yet,

Dr. Burke conceded that he had less sophistication with spreadsheets than younger colleagues at

his firm and that, at trial, his colleagues could run the electronic data on which he commented.

> Q. …Is it fair to say that you have less sophistication with these spreadsheets than the colleagues in your firm?
>
> A. Definitely.
>
> Q. Such that if you were to present either in a hearing or trial, you would bring one or more members of your firm in so that they could run the electronic data and you would describe it?
>
> A. Yes, sir.

(Dkt. 60-1 at 288-289.)

While Visionworks erroneously suggests that Dr. Burke could not analyze the data because

he did not prepare it, the use of assistants to review, summarize, and format data is neither unusual

nor disqualifying. Visionworks own expert, Dr. Timothy Snail, testified that a staff member

"generally carried out the analyses that I requested" in this case and that "most of them were

analyses of Visionworks' sales transactions data and related information." (Dkt. 63-1 at 6-7.)

While it suggests that Dr. Burke "could not apply his damages model to … individual

transactions," Visionworks abruptly confronted Dr. Burke at deposition with data in a complex

format and without identification or full context.  (Dkt. 60-1 at 251-252.) Dr. Burke later explained

that when he conducted reviews, using the Excel tools, of the underlying data, he was not looking

at pages formatted in the same way. *Id*. at 267. He further noted that computer programs could

easily be written to pull from the electronic sales data the item gross sales and calculate them for

each transaction. *Id*. at 269. In short, Visionworks fails to show that Dr. Burke did not analyze the

data or that his damages model could not be successfully applied. Ultimately, the data is the data and programs can pull the key information from that data.

Dr. Burke's fundamental opinions as to the "regular" price of Visionworks' glasses and the means of calculating damages are valid and confirmed by the electronic sales data, promotional calendars, and other evidence. Dr. Snail may disagree with Dr. Burke's conclusions and Visionworks may challenge certain details, but Dr. Burke's opinions are based on his substantial involvement in the case, his review of the key data, and his credentials as an economist. They pass the tests of Rule 702 and *Daubert* and, therefore, Visionworks' motion to exclude his testimony should be denied.

## II.    DR. BURKE IS QUALIFIED TO OFFER AN OPINION ON THE "REGULAR" PRICE OF VISIONWORKS' EYEGLASSES.

Dr. Burke's opinion regarding the "regular" price of Visionworks' eyeglasses is straightforward and cogent. The FTC defines "regular" to mean the price at which the seller "has openly and actively sold the product…for a reasonably substantial period of time, i.e., a 30-day period." 16 C.F.R. 251.1(b)(2). Dr. Burke notes that Visionworks, excluding customers using insurance, sold relatively few single pairs of eyeglasses at the BOGO list prices and some of those glasses were required by their manufacturers to be sold at list price. (Dkt. 60-3 at 2.) By contrast, Visionworks made the 40% off price available every month of the relevant period and the number of transactions at that price dwarfs those at any other discount price. *Id.* at 2-3.  Moreover, Visionworks' admitted, through its 30(b)(6) witness, that Visionworks moved customers unwilling to pay the BOGO price to a single pair alternative. (Dkt. 41-3 at 49, 164.) With this supporting evidence, Dr. Burke concludes that the 40% off price was Visionworks' "regular" price.

Dr. Burke testified that his two fundamental opinions – that the list prices *are not* Visionworks' "regular" prices and that the 40% off price *is* the "regular" price – are based on his

expertise in economics, primarily his training, experience and education. (Dkt. 60-1 at 263-264.) He further explains that the concept of a "regular" price is such "basic economics" that it would not likely appear in a learned journal.

> Q. So Appendix B are items you used in your report?
>
> A. In one way or another, directly or indirectly. Most of them are very indirect because, as I say in my report, this is just basic economics, what is the regular ongoing price of something. And, two, with buy one get one free, it is free. And, thirdly, I've mentioned price discrimination. Those are basic economic ideas. I don't think you could write an article that would be accepted in a journal, a learned journal in economics, explaining what those things mean because they're so basic.

*Id*. at 51-52.

While Visionworks argues that Dr. Burke's opinions have no basis in economics, its own expert economist, Dr. Timothy Snail, states in his rebuttal report that Dr. Burke "did not attempt to refute my *economic analysis* that Visionworks' default price is the list price…" (Dkt. 60-4 at 6 (emphasis added).) In his referenced initial report, Dr. Snail discusses, in a manner comparable to Dr. Burke's analysis, how list prices are used:

> List prices are often used in retail industries, where a seller may have thousands of goods to offer for sale. Retailers offer goods to customers for prices at or below their list prices. Thus, the list price is the maximum price that any purchaser could pay for a good. Retailers may find it efficient to offer temporary discounts for many goods…In the absence of the coupon, the consumer pays the list price.

(Dkt. 61-1 at 14.)

So, in what he calls an "economic analysis," Dr. Snail discusses list prices and the habits of retailers and concludes that the list price is the default price. But he does not show how his experience as an economist led to those conclusions or discuss his methodology or establish that his methodology has been tested or peer reviewed. Moreover, Dr. Snail argues that the list price is

"the most commonly transacted price" and concludes that "[f]rom an economic perspective, to the extent Visionworks has a "regular price" it is the list price." *Id*. at 6. Yet, when Dr. Burke engages in a comparable analysis and reaches a different conclusion, Visionworks complains that his opinion has no basis in economics. Visionworks cannot have it both ways; Dr. Burke's analysis as an economist is as valid as Dr. Snail's.[2]

Dr. Snail further testified that, as an economist, he could offer opinions as to whether Visionworks' prices were "misleading."

> Q. So are you able to opine in this case whether any of Visionworks' prices were unfair or deceptive?
>
> A. What I did offer an opinion on, in my initial report and in my rebuttal report, I offered – I looked into whether Visionworks' prices are transparent and whether they were misleading. And I concluded that they were – the prices were transparent…And I did not see any element of that that was misleading…

(Dkt. 63-1 at 23.)

Dr. Snail also testified that, even if a term is not a "term of art" in economics, he could, as an economist, examine the question if given a standard.

> Q. Is unfair a standard within your expertise as an economist?
>
> A. It is not a term of art in economics. If I were presented with a legal definition, as an economist I could accept that definition or evaluate that definition and try to examine it.

*Id.* at 24-25.

---

[2] The key difference in the experts' conclusions is that Dr. Snail considers sales at list price to buyers using insurance, while Dr. Burke excludes those sales as distorted by the insurance and not truly sales at "list price." This disagreement is yet another reason the divergent opinions of the experts should be presented to the trier of fact for consideration and resolution.

Dr. Snail further indicated that, even where terms are not terms of art in economics, an economist can assist the trier of fact in the decision-making process.

> Economists are very skilled at looking at – it's very commonplace to look at how consumers purchase, what information they have, and it's really up to the trier of fact to determine whether pricing is unfair or misleading or deceptive. Those are not, strictly speaking, economic concepts.  There are certainly elements of economics that I think may be informative…

*Id*. at 28-29.

In this case, the FTC provides a standard for determining a "regular" price; it is the price at which the seller "has openly and actively sold the product for a reasonably substantial period of time, i.e., a 30-day period." 16 C.F.R. 251.1(b)(2). Dr. Burke, as an economist, commented on that standard. According to Dr. Snail, that would seem to be an appropriate and proper role for an economist to play.

Dr. Burke testified that his central opinions are based on his experience in economics, including his training, experience, and education. *Burke Dep*. at 263. He further indicated that the concepts are so basic that they would not likely be the subject of scholarly articles. *Id*. at 51-52. Dr. Burke viewed his task in this case as a "simple, straightforward economic assignment."

> …I thought I had a kind of simple, straightforward economic assignment, what is the regular price of this product, and that can kind of be stated in one sentence, and was there a discount from the regular price…and what information would you need to demonstrate that.

Dkt 60-1 at 21.

Dr. Burke has over 40 years of experience as an economist. *Id*., Exhibit A. He has extensive experience in calculating damages, including calculations in mass tort cases and class actions. *Id.; see also,* Dkt. 60-1 at 28-33. He understands the difference between calculating damages for multiple individuals injured in an accident and creating a model for calculating damages across a

class. *Id*. at 29-30. While Visionworks argues that Dr. Burke has never given an expert opinion on the "regular" price of any item, there is no indication that Visionworks' expert Dr. Snail has rendered a prior opinion in this area or that the issue of "regular" price has been the subject of other controversies. Thus, Visionworks' assertion that Dr. Burke is unqualified to render an opinion fails.

In defining the "regular" price, Dr. Burke looked to both Webster's Dictionary and the FTC definition and found them consistent. (Dkt. 60-3 at 2; Dkt. 60-1 at 150-151.) The FTC defines "regular" to mean the price at which the seller has "openly and actively sold the product…for a reasonably substantial period of time, i.e., a 30-day period." 16 C.F.R. 251.1(b)(2). While Dr. Burke suggested that he might consider 29.5 days to be a "reasonably substantial" period and offered alternative, consistent phrasing of the term "regular," his opinion is drawn from and consistent with the FTC definition. His opinion, moreover, is offered to assist the the of fact, who will be instructed as to the standard by the Court.

Finally, Dr. Burke made clear that, in his opinion, the 40% off price was, pursuant to the FTC definition, the "regular" price of Visionworks eyeglasses. (Dkt. 60-3 at 1-3; Dkt. 60-3 at 263.) The charts on pages 2 and 3 of his report demonstrate that the 40% off offer dwarfed all other Visionworks discount offers both in terms of number of transactions and the number of months available, which, in this case, was the entire class period. (Dkt. 60-3 at 2-3.) While Visionworks argues that Dr. Burke referred to other, far less frequent prices as "regular," he made clear that those other prices were offered only briefly. *See,* e.g., Dkt. 60-1 at 156-157, 163-164. He also made clear that, in terms of numbers of transactions and frequency of availability, the 40% off offer was the most common regular price and the price at which Visionworks "openly and actively" sold its

eyeglasses, which is the test under the FTC definition of "regular." (Dkt. 60-1 at 156-157; Dkt. 60-3 at 1-3.)

### III.     DR. BURKE'S OPINIONS ARE RELIABLE AND ADMISSIBLE UNDER RULE 702.

Dr. Burke's fundamental opinions are well-founded, reliable, and supported by the evidence: that Visionworks continuously ran the BOGO-free promotion; that Visionworks sold relatively few glasses at the BOGO list price in the non-insurance market; that Visionworks' "regular" price for eyeglasses was 40% off list – the price at which it sold glasses most frequently; and that the damages of those who purchased at the inflated BOGO list price can readily be calculated. These conclusions are supported by the sales data, promotional calendars, and testimony of Ms. White-Keating. Visionworks' various attacks do not hold up under scrutiny or prove those opinions unreliable.

### A.     Dr. Burke's Opinions Are Grounded in Economics and Consistent with the FTC Definition.

As noted above, Dr. Burke testified that his fundamental opinions are based on his experience in economics and that he viewed his assignment in this case as a "simple, straightforward economic assignment." (Dkt. 60-1 at 21, 263.) Visionworks' expert economist Dr. Snail testified that, even where a term is not a term of art in economics, economists may be called upon to offer comment and, if given a standard, do so. (Ex. 2 at 24-25, 28-29.) Here, the FTC definition of "regular" price provides a standard and Dr. Burke appropriately used his knowledge and experience as an economist to comment on that standard and the facts of this case.

While Visionworks argues that Dr. Burke offered opinions "inconsistent" with the FTC guideline and offered alternative words for the term "regular," there were no fundamental inconsistencies. For example, Dr. Burke states that, whereas the FTC defines an "open and active"

sale as lasting 30 days, he would not quibble if it ran 29.5 days. (Dkt. 60-1 at 152-153.) He elaborates on what factors should be considered in determining an "open and active sale" (including how often the price was available and the revenue generated) and, while those factors are not included in the FTC guideline, they are not inconsistent with it and could legitimately be considered by the trier of fact in making a determination. *Id.* at 182-183. Similarly, Dr. Burke's conclusion that the promise of "free" eyeglasses under BOGO is illusory, while not using specific FTC language, flows from his overall analysis of Visionworks' pricing scheme in this context.

In the same way, while Dr. Burke elaborated on what he considers he considers a "regular price" – using terms such as "the open, available, stated price, known price" (Dkt. 60-1 at 10) and "the price at which a single pair of eyeglasses is openly and actively sold to the public" (*Id*. at 151) – his fundamental conclusion is clear and consistent with the FTC guideline. By a wide margin, Visionworks most often sold its single pairs of eyeglasses at 40% off list price and that, in Dr. Burke's opinion, is the "regular" price.

Finally, while Visionworks argues that he termed more than one price "regular," Dr. Burke made clear that, in his opinion, the 40% off list price was the "regular" price under the FTC definition. (Dkt. 60-3; Dkt. 60-3 at 163-164.) In a colloquial sense, the price of an item in any single transaction might be considered that item's regular price, but that would not be the price at which the item was "openly and actively sold" overall. Dr. Burke made clear that, even if a one-time, one transaction price is called the "regular" price for that item, the "regular" price under the FTC definition is different and is determined by "open and active" sales.

> Q. …[A]nother pair of eyeglasses, any one at all, if that pair of eyeglasses can be sold at the list price and was indeed sold at the list price, that's a regular price for that frame or that pair of eyeglasses, right?
>
> A. For that single pair of eyeglasses in that instant that's the regular price.
>
> Q. Because that's the price it sold at right?

A. **Yes, the regular price; however, that is not a price that is openly and actively sold, it's a one-time deal, and a one-time deal doesn't give you a regular price.**

(Dkt. 60-1 at 163-164 (emphasis added.))

**B.    Visionworks' Arguments About Testing and Peer Reviews Are Red Herrings.**

Visionworks' arguments that Dr. Burke's methods have not been subject to testing, peer review, error rate calculations, and publications are red herrings. Dr. Burke testified that the concepts are so basic that they would not likely be the subject of scholarly articles. *Id*. at 51-52. Visionworks' Dr. Snail offers his opinions in this area without showing that his methods were subject to testing, peer review, error rate calculations, etc. Moreover, there has been no indication that the issue of "regular" prices has been the subject of other controversies or scholarly analysis. This is a situation in which a standard exists for the determination of a "regular" price and economists can comment based on their expertise and experience and the available sales data, promotional calendars, and sales practices. The lack of scholarly analysis or testing in this particularized context is neither surprising nor disqualifying.

**C.    Dr. Burke's Methods of Calculating Damages Are Sound and Reliable.**

In this case, the data is the data.   Dr. Burke's method of calculating damages is straightforward and sound. The Visionworks' sales data is coded by a unique transaction number for each transaction. (Dkt. 60-3 at 4-5.) On a class-wide basis, damages can be calculated by multiplying the total amounts paid by class member by 40% and subtracting any other unrelated discounts. *Id.* On an individual basis, multiply the amount paid by the class member by 40% and deduct any unrelated discounts. *Id.*

While it argues that Dr. Burke's method has not been tested, Visionworks does not assert that the method would not work or that damages could not be calculated on a class-wide basis.

(Dkt. 60 at 19-20.) Visionworks suggests that transactions are coded by patient rather than purchaser, but a claims administrator could ensure that the proper class member, in such circumstances, was identified and compensated. Similarly, Visionworks' assertion that Dr. Burke, at deposition, did not calculate damages from a particular data example, presented without context, proves nothing. Dr. Burke explained that the data sample was provided in a format different than that he primarily reviewed and further that analysts more experienced in data manipulation could assist him. (Dkt. 60-1 at 267, 288-289.) Moreover, Visionworks' own expert conceded that particular data points could readily be gleaned from the sales data.

> Q. Is it the case that the electronic sales data contains the day on which the transaction occurred?
>
> A. Yes, I believe so.
>
> Q. And is it possible using simple – relatively simple technological tools to produce a report that showed every day on which there was a buy one, get one free transaction in the class period in the State of Florida?
>
> A. Technologically, absolutely.

(Dkt. 63-1 at 196-197.)

In short, Visionworks' electronic sales data is searchable and Dr. Burke's method of calculating damages could reliably determine damages on both class-wide and individual bases.

## IV.   DR. BURKE'S OPINIONS WOULD ASSIST THE TRIER OF FACT.

This is a case in which the FTC definition provides a standard for determining the "regular" price of a single pair of Visionworks' eyeglasses. The parties' experts disagree on what that regular price is. The jury would benefit by hearing their disparate opinions, and the bases for them, and then making its determination.

The fact that Dr. Burke has not previously testified in this narrow and unique area is not disqualifying; Dr. Snail does not appear to have testified in this area before nor has it been shown to have been the subject of other controversies. Similarly, the fact that the electronic sales data was

formatted and sorted by others is neither unusual nor disqualifying. Dr. Snail had others assist him in data analysis. Moreover, the data is the data and the trier of fact can judge the accuracy of the experts' evaluation of that data.

The bottom line is that, despite Visionworks' attacks on certain details of his testimony, Dr. Burke's fundamental opinions are straightforward and sound. They explain how Visionworks' BOGO-Free offer does not provide the buyer with a "free" second pair of glasses, but rather a pair priced at 40% above the price Visionworks regularly sells such glasses. Those opinions are based not only on Dr. Burke's experience as an economist and the standard provided by the FTC, but also on the indisputable electronic sales data, the promotional calendars, and the transaction numbers, and they are supported by the testimony of Visionworks' own witness. Dr. Burke's testimony would assist the trier of fact in determining the true "regular" price of the Visionworks' eyeglasses and, therefore, it is admissible under Evidence Rule 702.

## CONCLUSION

For the foregoing reasons, Visionworks' motion to exclude the testimony of Dr. John Burke should be denied.

Respectfully submitted,
s/ Drew Legando
_____
Drew Legando
Edward S. Jerse
MERRIMAN LEGANDO WILLIAMS & KLANG, LLC
1360 West 9th Street, Suite 200
Cleveland, Ohio 44113
T. (216) 522-9000
F. (216) 522-9007
E. drew@merrimanlegal.com
    edjerse@merrimanlegal.com

Brian W. Warwick (0605573)
Janet R. Varnell (0071072)
VARNELL & WARWICK, P.A.

P.O. Box 1870
Lady Lake, Florida 32158
T. (352) 753-8600
F. (352) 504-3301
E. bwarwick@varnellandwarwick.com
   jvarnell@varnellandwarwick.com

*Counsel for Plaintiff*

**PROOF OF SERVICE**

I hereby certify that a copy of this document was filed using the Court's ECF system, which will send notification of such filing to all counsel of record on September 16, 2019, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Signed by,

*s/ Drew Legando*

Drew Legando